FRANCES TASKER *vs.* INHABITANTS OF FARMINGDALE.

Kennebec.   Opinion June 15, 1900.

*New Trial.   Verdict.*

Three verdicts in favor of the plaintiff having been set aside by this court as against evidence, (85 Me., 523; 88 Me., 103; 91 Me., 521) at the fourth trial, no new testimony having been introduced, the presiding justice ordered a verdict for the defendant.   *Held;* that such verdict was properly ordered, and exceptions thereto should be overruled.   WHITEHOUSE, J., dissenting.

See *Tasker* v. *Farmingdale*, 85 Maine, 523; *Ib.* 88 Maine, 103; *Ib.* 91 Maine, 521.

ON EXCEPTIONS BY PLAINTIFF.

This was an action on the case to recover damages for personal injuries received through a defect in the defendant's highway.

After both plaintiff and defendant had presented all their testimony, the presiding justice ordered the jury to return a verdict for the defendant. To this order the plaintiff was allowed exceptions.

*A. M. Spear*, for plaintiff.

*O. D. Baker and F. L. Staples*, for defendant.

SITTING: WISWELL, C. J., EMERY, HASKELL, SAVAGE, FOGLER, POWERS, JJ.

FOGLER, J. This case has been three times tried to the jury and a verdict has, in each instance, been returned in the plaintiff's favor. Each verdict has been set aside by this court on the ground that the plaintiff's negligence contributed to her injuries. Eight justices of this court, four of whom are now members of the court, have concurred in setting aside one or more of such verdicts. At the fourth trial the testimony introduced by the parties differed in no material respect from that introduced at the former trials. The presiding justice properly ordered a verdict for the defendant. His ruling was in accord with the decision of this court, thrice expressed, and he must be considered as having acted under the direction of the Law Court.

We think the order of the presiding justice should stand and that the exceptions should be overruled.

*Exceptions overruled.*

DISSENTING OPINION BY MR. JUSTICE WHITEHOUSE.

The justice who presided at the three jury trials of this case has hitherto been precluded by the statute from participating in the decisions of it by the law court. Although his rulings were only nominally brought in question, the exceptions were never argued before that court. Further discussion of the merits of the case may now be unavailing, but in order that his long silence may not

be deemed acquiescence, he feels constrained to express his dissent from conclusions which have seemed to him unwarranted and unjust, and to point out the original errors and misconceptions which led to this unfortunate result.

The covered carriage in which the plaintiff was riding in the town of Farmingdale, in the evening of the ninth day of May, 1891, was overturned by reason of the defective condition of the highway at the easterly end of a culvert extending nearly across the way; and the plaintiff thereby sustained a severe injury for which she seeks to recover damages in this action.

The highway in question was the river road and principal thoroughfare leading southerly from Augusta through Farmingdale to Gardiner. It had recently been subjected to a new mode of use by the construction of an electric railroad, which, at the point of the accident, was located on the westerly side of the highway. By reason of this fact extraordinary repairs had been made on the highway at that point, immediately prior to the accident, the effect of which was to widen the traveled part of the way by extending it to the easterly side. But the old culvert across the way at that point remained unchanged, the easterly end of it being more than two feet from the easterly side of the road. Before these repairs were made, the easterly shoulder of the road was more pronounced and nowhere extended beyond the easterly end of the culvert. The grass had been allowed to grow up over this shoulder, and the extreme easterly line of travel, as plainly marked by the wheel tracks and the growing grass, was two feet into the road from the easterly end of the culvert. Indeed, there was nothing in the condition or general appearance of the road, before the repairs, which would invite public travel out on the easterly side of the road beyond the end of this culvert. Thus the danger of driving carriages off of the easterly end of the culvert had been practically avoided.

But the conditions had been essentially changed by the repairs. Recognizing the tendency of even gentle and well-trained horses to become frightened when in close proximity to an electric car, especially in the evening when it is provided with a headlight, the

municipal officers of Farmingdale decided that reasonable safety and convenience required the road to be made smooth for travel to the extreme easterly limit. Thereupon, all of the stones, large and small, were removed from the old ditch, and by the aid of the plow and road machine, the old shoulder was partially removed and the entire surface of the road, at the north of the culvert, was smoothly wrought into a gentle slope from the centre of the road to the easterly bank. The old ditch no longer existed, and the road was so nearly level that, with the exception of the open drain at the end of the culvert hereafter described, it was entirely safe and convenient for travel, and was manifestly so designed, over the entire width from the railroad track to the easterly bank. The condition on the southerly side of the culvert was substantially the same. In effect the traveled way had been widened above and below the culvert, but the culvert itself had not at that time been extended in length to conform to this increase in the width of the wrought part of the road. It required an extension of more than two feet to correspond with the new line of travel created by the repairs. Furthermore, the culvert was entirely below the level of the road, and was so constructed that the easterly mouth of it was invisible in the day time at a distance of twenty feet to one approaching from the north. From the top of the ground, at the easterly end of the culvert, to the bottom of the drain there was a fall of two and one-half feet.

Here, then, was a dangerous trap, not only for the unwary, but for the reasonably careful driver. The road was so wrought as to invite the traveler to drive out to the extreme easterly bank ; but if he did so drive and failed to discover the open end of the culvert in season to turn his course inward, the carriage would drop down two feet or more on the easterly side and inevitably be overturned. It is doubtful if this open drain, at the east end of the culvert, could be discovered in the day time in season to avoid such an accident, and it is quite certain that it would not be so discovered in the night time by the exercise of ordinary care on the part of the traveler not familiar with the existing conditions.

The plaintiff had been in the habit of driving over this road

before the construction of the street railway, and before these changes were made in the highway; but there is no evidence that she had ever been over it after these changes were made prior to the day of the accident. On the morning of that day she rode over it in a covered carriage, going northerly, with her two children; but she was not aware of the existence of this particular culvert and her attention was not attracted to the condition of the road at that point. Between eight and nine o'clock in the evening of the same day she was driving over it on her journey homeward, going southerly, when she saw the electric car with its head-light approaching to meet her. What subsequently occurred is thus described by the plaintiff in her testimony: "I have been accustomed to drive horses for the last twenty years. . . . . When I got down to the place of the accident, I remember that the electric car was coming and we didn't know whether the horse would be frightened, but I supposed he would not, because he was a very kind horse. After making a remark to the children, I concluded to drive outside to avoid the car as much as possible, and the first I knew the carriage tipped over. . . . . . When I was driving down there I had hold of the reins very securely, I should say, because I was of course driving carefully on account of my children. I had the reins in both hands after the carriage tipped over. I reined my horse out to go on the opposite side of the road from the car at the time of the accident. So far as I could tell by the rolling along of the carriage the road was smooth, I should say; I thought there would be no difficulty. I think I could see the road along. I thought it looked smooth. I reined out to avoid the car as far as I could. When the horse saw the car he threw up his head and quickened his pace a little perhaps. Don't think I could tell how far from me the car was when I first saw it. It was all in plain view. I could see the head-light very plainly. It was coming right along. . . . . . . The first notice I had of anything as I was driving along was the dropping into the culvert, and I wondered what it was. I remember that plainly." On cross-examination she further testified: "I did not think the horse was afraid of the electric cars. I had driven it many times

before past the electric cars and he was not alarmed. I suppose he was safe to drive anywhere I had chosen. . . . . . He quickened his pace slightly but was still going at a very moderate trot. . . . . He was under full control all the time and did not seem to be alarmed at all. . . . . The car was probably proceeding at its ordinary rate of speed."

Thus happened, what might reasonably have been anticipated would happen, under the same or similar circumstances. The plaintiff, in the exercise of her best judgment and of all the prudence and foresight of which she was capable, while endeavoring to avoid the probable consequences of a close proximity to the electric car, drove to the left side of the road, not into a ditch, in the ordinary sense of the term, but along a smooth and nearly level road wrought for public travel, until she reached the invisible culvert, which had not then been extended to correspond with the increased width of the traveled way, when the carriage dropped off of the easterly end of it into the open drain two and a half feet deep, and was overturned. She had been lured into the pitfall which had thus been created by the defendant town.

Upon these facts an appropriate verdict in favor of the plaintiff has three times been rendered by the jury and three times set aside by the law court. See 85 Maine, 523; 88 Maine, 103; 91 Maine, 521. But, with all deference to the action of the majority of the court who subscribed to those opinions, it is most respectfully submitted that the verdict of the jury was in each instance clearly justified by the evidence; and that the first opinion of the court which was adopted, as the basis and authority for the other two opinions, is shown by its own terms to have been founded on a misunderstanding of the condition of the road, and a consequent misapprehension of the testimony in regard to the plaintiff's conduct, and a misconception of the ground of the defendant's liability.

It is stated in the opinion that the plaintiff "was driving over a road with which she was perfectly acquainted." But it has been seen that, with respect to the actual condition of the road after the repairs were made, as it existed at the time and place of the accident, she was absolutely unacquainted with it.

It is stated in the opinion that "it is negligence to drive out of a well-wrought road and into the ditch without first ascertaining whether it will be safe to do so."

It has been seen that the plaintiff did-not "drive out of a well-wrought road" into a ditch; but that she drove all the way inside of a "well-wrought road," so nearly level that she was unconscious of any inclination of the carriage until the left wheel suddenly dropped into the open drain at the end of the culvert. Here the process of widening the road had abruptly ceased and the work was left uncompleted.

It is stated in the opinion that "thoughtless inattention, the very essence of negligence, was the cause of the accident."

It has been seen that the plaintiff was driving with all the attention and vigilance of which she was capable, as a mother guarding the safety of her children, with all her senses and faculties alert in the endeavor to meet the exigencies of the situation; and that the negligent omission of the town to complete its repairs was the cause of the accident.

It is said in the opinion that "it is no excuse for driving into an unseen and unlooked-for culvert, that possibly it might not have been seen if it had been looked for." But it has been noted that the mouth of the culvert was obscure and hidden and absolutely invisible at a distance of twenty feet to an ordinary observer approaching from the north, even in the day time. In fact she had no knowledge of the existence of the culvert, and to the jury taking a view of the location it must have been manifest that she had no reason to look for a culvert at that point. This imputation of negligence against the plaintiff is also wholly unsupported by the evidence.

It is said in the opinion that her horse was not frightened and that she "unnecessarily reined him out of the road." It has been seen in the first place, that the horse was not "reined out of the road," but was wholly in the road all the while. It is true, that after the event it was known that the horse was not frightened; but the plaintiff testifies that when the horse saw the approaching car he threw up his head and quickened his pace and she "didn't know

whether he would be frightened or not." As a matter of extra care and precaution she drove to the extreme left of the road. This was the instinct of a prudent driver and not the act of a negligent one. The liability of even a safe and gentle horse to take fright at a street car approaching with a head-light in the evening, is a matter of common knowledge. If it can be deemed an error of judgment to drive so far to the left, it was an error disclosed only by that knowledge which comes after the fact, and an error which a great majority of prudent drivers would have committed under like circumstances. In any event it cannot be deemed a want of ordinary care and caution on her part. It is immaterial that there was a width of twenty-one feet of smooth road, east of the railroad track, on which the plaintiff might have driven across the culvert. She was driving where travelers with teams had a legal right to drive, and where they had been invited to drive by the acts of the town. It was all smoothly wrought for public travel, and if it had been made twice as wide, travelers would have been justified in using the entire width of it. It had every appearance of a safe and convenient road, and there was no indication of the pitfall which existed within the apparent limits of the traveled way.

The way was undoubtedly defective and unsafe in the respect and for the reasons above stated. It was so found by the juries who viewed the location, and it was practically conceded in the opinion of the court in imputing negligence to the plaintiff as the ground of the decision. The plaintiff sustained a severe injury by reason of that defect. She was in the exercise of all ordinary care, prudence and vigilance. All the requirements of the statute were fulfilled, and all the propositions underlying her right to recover fairly established by the evidence. This court still has the opportunity and the power to do justice in this case. The maxim of stare decisis is not applicable to such an opinion between the immediate parties, or to any case decided upon a misapprehension of evidence. No principle of law is imperilled by the correction of an error in a matter of fact. The stability and certainty of the law are not involved. Just pride of opinion, as well as a proper

sense of duty, must impel a court of justice to correct its error, not to adhere to it.  *Shaw* v. *Boston and Worcester Railroad Corporation*, 8 Gray, 45.

To this end, the case should again be submitted to the jury.